We'll move to the second case set for argument, which is Todd Lewis Asker versus Edmund Brown. Case numbers 18-16427, 19-15224, and 19-15359. So, you may argue when you're ready. Good morning, your honors. I am Deputy Attorney General Jeffrey Fischer, and I represent Governor Gavin Newsom and the California Department of Corrections Rehabilitation Parties. At this time, I'd like to reserve three minutes for rebuttal. May it please the Court. This field deals primarily with construction of a settlement agreement under California law. As I'll explain, that settlement agreement has now served its purpose. It provided that CDCR would adopt certain reforms, which it has, and that the district court and plaintiffs would monitor CDCR's compliance with the agreement for two years, which they have. Under the agreement, it is time for this case to end. But the district court found that CDCR breached the agreement in two ways, and issued extensive remedial orders that extended its supervision period as to those issues, which is the subject of the first appeal, and separately entered an order extending the agreement for at least one additional year based on purported due process violations, which is the subject of the second appeal. I plan to devote about eight minutes to the first appeal, then move to the second. As to the first appeal, I plan to address three contract construction issues that will require reversal. First, the proper construction of the general population or release provision of paragraph 25, and why the general population order was improper. Next. How much different is the 180 design facility from the, I believe it's 120 design facility? Your Honor, it's a 120, it is, sorry, 180 design facility versus a 270 design facility. And it really determines the arrangement of cells around a centralized control booth that allows- How much out of jail time does it differ between the 270 and the 180? The record doesn't disclose anything about the conditions and how the conditions would differ between a 270 design facility or a 180 design facility. And the issue shouldn't concern the court as the parties didn't negotiate about the general conditions in the general population at any time and didn't incorporate it as any term of the settlement agreement. I'll move directly to that provision. As you pointed out, the court found that the CDCR breached paragraph 25 of the settlement agreement and promised that it found that CDCR did not comply with was that the eligible class members would be released from the issue and transferred to a general population level for 180 design facility or other general population institution consistent with his case factors. Now, in context, that term is unambiguous because the general population level for 180 design facilities were facilities that existed in CDCR's prison system at the time the parties entered into the agreement. And their conditions were what they were, whatever they were, they weren't incorporated as part of the settlement agreements, paragraph 25. Plaintiffs acknowledged that the inmates had been transferred to those facilities throughout the state. That's on page 190 of the excerpts of record where they described that a great majority of the class members were released from the shoe and are now housed at various institutions around the state. And the evidence that the defendants submitted, which is on page 117 and 118 of the excerpts of record also supports that conclusion where the S.L. Farrow describes the process CDCR went through to review the files of the gang-validated inmates in the shoe and transfer. So is your general argument that the settlement required them to transfer the people out of the SHU but had very limited or only implied conditions about what their conditions would be once they got into general population? Our position is that the agreement required CDCR to transfer them, yes, as you say, and that the conditions were what the conditions were at that time. And so if the parties knew how to incorporate requirements on conditions of confinement in certain units when they intended to, like paragraph 29 of the settlement agreement lays out a specific amount of out-of-sale time for inmates who were transferred to administrative SHU status. They did not incorporate any type of provision like that in paragraph 25. And the plaintiff's acknowledged on page 160 of the excerpts of record that parties never negotiated about what the general population conditions would be. Was there any evidence presented that these transferred prisoners were treated differently under the generalized regulations for the prison than other prisoners? No, Your Honor. The evidence is actually to the contrary. That declaration on page 117 of the excerpts of record lays out that the inmates have been transferred from the SHU to these general population facilities where they were subject to the same rules and restrictions as other inmates who were already housed there. They're housed alongside other general population inmates and treated the same way. To the extent that they have a claim regarding the conditions in general population, that would be the subject of different lawsuits. So one of the impressions that I had was that one of the regulations apparently is that they want to make sure that the prisoners fit in with a group before they're let out into the general population when they're outside. And here there was some evidence that they weren't finding groups that they were jailing with. And so therefore they were keeping them, they were given in the outside time, but they weren't in the cage, I guess, or whatever it is you want to call it. Does that, I mean, I guess that's just not addressed by it. It seems like they may have been at a material disadvantage compared to other prisoners who came in through the normal admission into the prison system because they were kind of coming in from a different system. But that doesn't seem to be enough to treat them differently. Anyway, I'd like your response to that. Your Honor, I think that there is a distinction between the two issues that you're discussing. I think that you've blended a little bit the walk-alone order that I plan on discussing second with the general population order that I plan to start with. There is no evidence in the record that inmates who have been transferred to the general population were ever treated differently in the general population than everyone else who's there. What you're referring to is the period of walk-alone status at the beginning of an inmate's term in the restricted custody general population has a somewhat confusingly similar name. I'm gonna refer to it as the RCGP. The RCGP is a separate housing unit that was created by the settlement agreement for inmates who were going to be released from the SHU who were eligible from release. But because they had developed so many enemies through their associations with prison gangs, there wasn't a general population unit that they can safely be transferred to. If they were transferred to, as far as they were aware, any of the general population facilities at their security level in the entire state, there was a good chance that they would be assaulted or killed. So they created the restricted custody general population for that purpose. But for that same reason, they couldn't immediately put all of the inmates who were designated for the restricted custody general population into the same area at the same time because some of those inmates had developed enemies who were other inmates who were in that same group. So they had to work to try to figure out which groups those inmates could safely be placed with to program collectively. And there is a collection of inmates who are on what we call walk-alone status who CDCR has just not yet been able to identify a group in which they can safely be placed to program in the RCGP. But that's separate from the general population order that I plan to discuss first. As to the general population order, the only promise at issue here is that the inmates would be released from the SHU and transferred to a quote general population level four 180 design facility. And it is undisputed that that has happened. And so there is no evidence that CDCR breached paragraph 25 of the settlement agreement. And so the general population order and its associated remedial plan should be reviewed first. So are you saying that the district, are you indicating that the district court was wrong when the district court found that there was an implied out of self time with the general population that would be greater than the out of jail time that they were having in SHU? Yes, your honor. And it's our position that that's an issue of contract construction. So it's one that's court reviews de novo. And there is no evidence in the agreement and no parole evidence that was considered that would alter the language of paragraph 25, which just required inmates be transferred from a certain type of facility, which was one that existed in both parties were aware of to another one that again, existed in both parties were aware of the extent that there are issues with conditions, they would be the subject of a different lawsuit because the scope of any class affected would be the entirety of the general population in these facilities, not just the 1600 members of this particular class in this case. And again, the parties, the settlement agreement further supports that because parties clearly knew how to incorporate conditions of confinement requirements in the settlements terms when they wanted to. Could I ask the question, if you could allow me to do so. I'm concerned about the walk alone status. How is that walk alone status devised? Is it within the plan? Or was it something that was developed in order to come close to the plan? And whether or not the court heard in holding it's only in development of that walk alone status. Yes, Your Honor. Paragraph 28 is the paragraph that created the Restricted Custody General Population Unit, the RCGP. And it is in fairly broad strokes. So it does not determine exactly how CDCR would implement the RCGP. So one of its decisions in implementing it was to create this preliminary walk alone status to as a period during which it could observe the inmates and determine which existing groups were reconstructed groups, that inmate can safely be placed. So it is not outlined in the agreement, though it is also not prohibited by the agreement. It would be part of the CDCR's usual default discretion to operate prisons as they see fit. So the exact- No, the one that was not in the agreement. How is the agreement violated then if it's not in the agreement? Yes, Your Honor. The portion of the paragraph 28 that the district court found CCR in breach of is the part that is at the bottom of page 452 of the excerpt of record. And it states, programming for those inmates transferred to or retained in the RCGP will be designed to provide increased opportunities for positive social interaction with other prisoners and staff, including but not limited to. And then there is a itemized list. And the relevant items in that list are, one is yard slash out-of-cell time commensurate with level four general population in small group yards, in groups as determined by the Institution Classification Committee. And the other is leisure time activity groups. Court found that that including but not limited to clause was an unqualified promise that every inmate transferred to the RCGP would receive every item of programming in that list. And the use of walk-alone status prohibits the placement in groups, so they would not be in group yards or receive leisure time activity groups. What are these outside cells like? I know you gave us the size, but are they all kind of side by side? Yes, Your Honor, they're immediately adjacent and on their longer side. So the inmate is inches away from an inmate in the next adjacent individual exercise yard, and then approximately 10 feet away from the one beyond that, and then 20 feet from the one beyond that. And the evidence is that they regularly socialize while they engage in their individual exercises in those units. Effectively though, isn't the district court's order basically, it would require the prison to violate its own regulations by allowing them, not putting them in the walk-alone status and putting them at risk in violation of their own regulations. Is that correct? Yes, Your Honor. It would be a violation not only of its own regulations, but of the CDCR's Eighth Amendment duty to protect the inmates from known risks of serious harm, which includes risks of threats from other inmates in the unit. And so we believe that an appropriate interpretation of that sentence of the settlement agreement is that CDCR is required to provide increased opportunities for positive social interaction to all inmates in the RCGP, but retains discretion to identify certain types of programming that just aren't appropriate for certain of the inmates in that housing unit. And the evidence is undisputed that CDCR does provide those increased opportunities for positive social interaction to all inmates in the RCGP, including those on walk-alone. In paragraph 28, it talks about a duty to assign this type of activity in groups as determined by the Institutional Classification Committee. What's the Institutional Classification Committee? That is one of the committees of staff members within CDCR that is involved in making classification decisions, which would include things such as what level of security an individual inmate is assigned to, but also keeping track of things such as their respective security concerns so that they can help determine who would be an appropriate inmate to group another one with. So it's just a selection of CDCR staff members who make determinations about classification among inmates. Is it kind of an ongoing, continually operating committee that makes daily decisions about inmate classification or placement? I'm not aware of whether its composition changes between the individual instances, but it is used very frequently in many decisions about inmate classifications. So I apologize if that's not helpful. Other than that, the information isn't. But just to finish my prior thought though, the record on page 371 of the excerpts of record, and again, on 113 of the excerpts of record goes over the particular types of programming and social interaction that inmates who are on walk-alone status and not are entitled to in the RCGP. I'd like to move on in my remaining minute or so to just touch on the extension motion, the second appeal. First, why I'd first like to discuss the automatic termination clause of paragraph 41 and why the purported due process violations that the district court found didn't justify an extension under that paragraph. I'd also like to clear up just one point in the record. The reply implies that the RCGP placement is permanent, but it's not. The record discloses on page, this is on the sealed excerpts of record of the second appeal at page 836, that at the time of the appeals, four inmates had been released from the restricted custody general population, out to general population because the departmental review board concluded that their safety issues were no longer in existence. Two had been released on parole and several had left the RCGP because they had decided to be released. Our position as to the extension motion is that paragraph 41 of the settlement agreement is the automatic termination clause. And it provides only two types of, it provides that the settlement agreement will automatically terminate after 24 months unless plaintiffs meet a specific burden. That is to establish a current ongoing and systemic violation of either the eighth amendment or the due process clause, but not just any, one that exists from one of two sources, either it exists as alleged in the plaintiff's complaint or it exists as a result of CDCR's reforms to its step down program or the shoe policies contemplated by the agreement. And the, we explain in our briefing that the interpretations that the plaintiffs asserted and the district court adopted as to those two buckets effectively are improper constructions of the settlement. That a violation as alleged in the complaint must be something that in the complaint is alleged to violate the eighth amendment or the due process clause. And that a violation is only a result of reforms to the shoe policies or step down program. If the reforms to those step down program or shoe policies actually caused the due process violation. See that I'm out of time. I would like to reserve the remainder of my time for rebuttal unless there are further questions. Thank you, counsel. Mr. Miller. Thank you, your honor. Samuel Miller for plaintiff class and the police in this case. May it please the court. This case is about the continued severe isolation for prisoners who were supposed to be released from conditions of solitary confinement. And the continued isolation happens in two ways. The first is through the release to what are called general population units but do not actually. And the second is through the walk alone status in the RCGP. Let me just ask on the first of those. Is there comparative evidence of the time out of cells of the people transferred to general population from SHU compared against people who are otherwise in general population at 180 facilities? Your honor, the evidence that we put in, which is overwhelming has to do with the class members who were released from SHU into these nominally general population units. Yeah, but if you don't have a comparison, how do you know that general populations are actually out of their cells more than the SHU members who've been transferred to general population? Well, there are a number of pieces of evidence in the record, your honor. Now, the first is the defendants themselves have represented to the court. The general population prisoners get 10 or more hours of yard time, obviously out of cell. The other is the regulations that have the force of law in California and which provide that SHU and general population are mutually exclusive, that SHU gets approximately 10 hours of out of cell time. And the general population is defined by the out of cell time for recreation and other activities, except as constrained by security. And so the regulatory scheme and the representation of defendants of 10 plus hours of yard time set the norm of what general population is in California prisons. So the language in paragraph 28, you have to show a violation of that, right? For general population, it's paragraph 25, your honor, if that's what we're focusing on. And that's the paragraph with the clause general population level four, 180 degree design. Okay, but. Are there, let me ask this then. Are there any, as I read paragraph 25, it only addresses the facility that they have to be transferred to. It doesn't deal with any out of cell requirements. Where do the out of cell requirements come into play? Your honor, there's three pieces to the operative clause in paragraph 25. General population, level four, 180. So 180 is an architectural term, which Mr. Bishop described. Level four is the classification level of the prisoners. And then general population is the modifier of those other two parts of the clause. And general population is a term in the agreement, which is subject to interpretation. It has meaning. And the meaning in California, and we were entitled to rely on this when we made the settlement agreement, is that it is subject to the regulatory scheme that subsequently before the district court, CDCR took the position that out of cell yard time for general population prisoners is 10 or more hours. And so- Paragraph 25 says transferred to a general population level four, 180 design facility. Where does it say anything about out of cell time? In paragraph 25. Your honor, the out of cell time is packed into the term general population. General population has to have meaning. If we had said these prisoners could be transferred simply to level four, 180s without putting in general population, it would be a different story. But CDCR cannot simply call a unit general population and then treat the prisoners in any way that they please. I don't think they were treating them in any way that they please. And that's what I'm trying to focus on is how... I think you're right that these prisoners were treated differently than other prisoners in their out of cell time, but it seemed to be consistent with the overall regulation, overall regulations because of the uniqueness of these prisoners coming over. So can you address that? You're not suggesting that the use of general population precluded the prison from applying its own discretion on how these prisoners allocated that out of cell time. Well, the prison authorities have discretion, but that discretion has its limitations. If they're going to treat somebody as if they're in restricted housing, then that has to be on the basis of disciplinary infractions that would justify that kind of treatment. So a part of the settlement is this change from putting people into solitary housing based on gang status and changing it to a disciplinary based system. And so if they're going to take somebody out of SHU and put them in general population, then their discretion is limited by that person's conduct. And all of these class members have been released from SHU. They have been discipline free. They have gone into... To general population. And then half of them are being held in their cells longer than they were when they were in SHU. The evidence that the district court relied on and to which this court gives deference under the clearly erroneous standard is that 50% of the class members that responded in our survey, in which were a representative sampling, are in their cells 22 hours or more every day on average. You have, in paragraph 29 of the settlement agreement, it deals with people remaining in SHU, right? Correct, Your Honor. But you have a very specific time out of cell that you explicitly negotiated in that, right? That's correct, Your Honor. That's called administrative SHU. So if you were able to get a specific commitment from the prison with regard to SHU inmates, why wasn't it included with regard to the former SHU that were going to general population if that was part of the agreement? Right, so Your Honor, we had a situation where most of the prisoners from SHU  And general population has a meaning within the regulatory schema with what CDCR has conceded and in the general sense of the correctional industry, if you will. Administrative SHU was a very select small group of prisoners who were going to be retained in restricted housing, but for whom they otherwise would have been released with the regular transfer out of the settlement agreement. So the administrative SHU prisoners, we needed to make sure that by agreeing to allow a continuation of a restricted facility, that those prisoners would still get some of the benefits of less isolation. So we were trying to strike a balance between a restricted facility and getting those few prisoners the benefit of the agreement. These are people who had been in SHU for years and probably decades on end. And we wanted to make sure that some of that social isolation was reduced, even though we were agreeing that they could remain in a restricted setting. I guess, I think the point the government's council was making was when you knew how to negotiate a specific time out of cell when you wanted to, and they knew how to push back on that. So you included this with regard to the SHU inmates, but there was nothing more than kind of a general population description for the people going back to this 180 facility. Right, I mean, your honor, I understand the distinction that in paragraph 29, there's a specific reference to the amount of cell time, in paragraph 25, there is not. And the reason is that for the vast majority of the transfers, there was an understanding that they were going to general population. We put general population, we put those two words into paragraph 25 twice, first as a modifier on these 180 design, and the other in the following clause, which says other general population. So it is a term of art, which has meaning in the regulations, it has meaning in the correctional. So the 180 facilities existed before the agreement, right? 180 is an architectural design. Okay, so they existed, is the 180 facilities completely filled with the class members, or do they have other inmates who are otherwise housed in 180 facilities? My understanding is that there are other non-class members in some of the 180 facilities. Is there any record evidence that the out of cell time of the other 180 residents is significantly different than the former SHU members who are now in the 180 facilities? Well, the evidence in the record is that general population prisoners get 10 or more hours out of cell in the yard per week. And that is what CDCR has represented. And it's consistent with the regulations. It's consistent with the standards set by the American Correctional Association, the Department of Justice. So there is an overwhelming understanding of what general population means. And that is the only evidence in this record of what actually occurs in general population. Everything else, the defendants has said. So do you, I guess, I'm not sure you heard what you, is there evidence that the class members are having less out of cell time than the other SHU members, or the other 180 inmates? Your Honor, the evidence that we presented to the district court, which the district court relied on, is based on surveys of our class members. That's who we had access to. And it's an extensive survey, and it's all in the exercise of record. And declarations from eight of the class members. One of them, for example, is Mr. Esquivel, who spent 13 out of 23 days in his cell except to go pick up his meals. And so that is the evidence that we were able to put into the record. Defendants did not challenge any of those declarations. They did not put in any evidence of their own. We met our burden. The district court relied on it. And to answer your question directly, Your Honor, in this record, the defendants have not put in any evidence of what non-class member general population level four prisoners get in terms of their actual out-of-cell time. So you don't know whether they're getting, you don't know whether they're getting the 10 hours that you're stating. You're just saying that's part of the regulation that says that they all get 10 hours a week, but you don't know whether that's actually happening in practice because of any discretion that the prison officials are using. So what I know is that on a direct question in front of the district court, that DDCR represented the general population prisoners get 10 or more hours of yard time. Now, I cannot tell you whether that is a norm, whether, I would doubt that in every single example, that that is absolutely true, but it is a norm and it was a representation to the district court. And I would be surprised if defendants would not stand by that. But, okay, so I hear, thank you for clarifying that. And as I understand it, you're not conceding or you are conceding or you're not contesting that at least 50% of the former SHU prisoners are receiving those 10 hours. You're saying 50% of your clients or class members are under 10 hours and some apparently significantly under, but you're not, but you would agree that some of the class members are receiving those 10 hours? Some are, your honor. Actually about 80% of the class members are getting less than two hours of out-of-cell yard time per week. So, that's right, your honor. Okay. That's right. And that's based on your surveys. That is based on the surveys and on the eight declarations that we submitted. We could keep going on this, but I wanted to ask if I can turn your attention to the second case. I had a question on the jurisdictional issue. I thought this was interesting that the magistrate judge, this never went to the district court judge. Is that correct? The ruling on the walk-alone status in the RCGP is from the district court judge, the article three judge, your honor. Well, but I'm talking about the prisoner's settlement extension motion. Oh. And am I, you're on both cases, right? No, we are not, your honor. Okay. I know that Mr. Fisher referenced the extension. I think he was referencing paragraph- Okay, I apologize. Keep going on what you were saying, so. Let me perhaps ask about the walk-alone. So, and I don't want to be flippant, but do your clients really want to be in crowds of other inmates at this time? Do they want to be, have five of them in one outdoor yard within close proximity to each other? That's what they want? Your honor, these clients have been in segregated housing units for a very long time, years and even decades. And the impact of that social isolation and lack of environmental stimulation has been severe. And we have submitted a report from a Stanford group and there's an amicus brief that goes into that. But to directly answer your question, your honor, if your reference is to the current situation with the coronavirus, then the answer is that our clients want to be safe and they want to do whatever social distancing and other measures will keep everybody safe, absolutely. But this motion began before the virus and hopefully we will pass it. They're in, are these cells kind of a wire from ground to 10 feet tall? Outdoor yard, the outdoor yards, are they wire from the ground up to 10 feet tall? The outdoor yard for the RCGP? Yes. I'm not catching the question. The question I'm trying to ask, how different is it for an inmate to be in an outdoor yard immediately adjacent to other inmates in outdoor yard, but not in the exact same cell? How different is that from, in terms of, you know, well-being? In other words, what difference does it make if you've got four other inmates on either side of you, albeit separated by a wire fence, but in close proximity? I understand, your honor. It's a very big difference. It's a very big difference. This is why we put it into the settlement agreement that they had to be in groups, and that groups means two or more people, and that there is the possibility of physical contact, and that there is the kind of interaction that you can get that can never be had through a cage. And the district court understood that a group means two or more people. And just to touch on some of the questioning earlier, I'm aware that I'm almost out of time. If I could just finish this, I'd be happy to take any further questions. The district court understood that CDCR should have some discretion, and she built into the remedy that CDCR should be able, on a short-term basis, if they have an individual prisoner who just cannot be with anybody else in that unit safely, that they can go ahead and keep that person on a walk-alone status on a short-term basis until a group of at least two people can be found. So it is a decision that finds the violation because the contractual terms are clear, but then gives a remedy that does give appropriate discretion to the prison officials. If I may just wrap up, Your Honor. Let me press you on one question on that. The actual paragraph 28 says, in groups as determined by the Institution Classification Committee. So in the settlement contract, did you leave it to the discretion of the Institutional Classification Committee? The discretion of the ICC is to determine the people that will be in the groups, but we did not leave it to the ICC to determine whether individuals could be excluded. And that's what the court read it as well. You're over time, but let me ask you one question on my time. I've had some of these prison cases, and I'm not sure that our court does a great job institutionally in being able to help solve problems. But we have found that very often, people with understanding of the problem get together and able to solve them. Have you, has there been an attempt to mediate either the first appeal or the second appeal through our mediation process that we have in the circuit? Your Honor, we have always tried to meet and confer and to discuss informally and to seek informal resolution of these motions and others. Unfortunately, and to answer your question directly, neither party utilized the Ninth Circuit mediation that was offered, so to be direct about that. But we have always tried to resolve these. In fact, on the remedial state and remedial phase, the district court ordered the parties to meet and confer. We did that. We presented proposals to the district court. The defendants refused to issue proposals. And so- I understand you have a tough problem, but remember, we have a mediation group that solved a problem between two tribes of Indians that had gone on for 25 years, and that was complicated. I think it might be wise if you wish to, while you both have it on your minds, to see whether or not you want to try to mediation. If so, as you know, it's cost-free, and we have very, very talented people to settle cases on an appeal. This case is complicated enough. I suspect that whatever our decision is, you'll both disagree with a good part of it. We're giving you a last opportunity to come up with something that's mutually agreeable. So if you would please discuss this with each other, and within 24, 48 hours, let us know whether you're interested in going to mediation. If not, we'll give you a decision. We can't guarantee that it'll be a better outcome than something that you could mediate together. Understood, and we appreciate that, Your Honor. We will talk with defense counsel immediately following this. All right, I think we've still got some time for rebuttal. So Mr. Fisher, if you want to go ahead. Yes, Your Honor. I'd like to begin by clearing up a few questions that were asked to the defense counsel. One, the evidence says that class members are housed alongside other non-class members in the general population, and there is no evidence that they have ever been treated differently in the general population than other general population inmates, which is why we contend the- As to the walk-along, you're now talking about the walk-along provision. No, Your Honor. Right now I'm talking about the general population order, the first one. Well, okay, so that is the question. I mean, do you deny that there's 10 hours that's recommended for the general population of outdoor time? No, Your Honor, that is the intended amount, but that institutional restrictions sometimes cause that to be- But what are the institutional restrictions, or do we need to get into every one of these? They presented evidence of one individual who didn't receive any outdoor time for 13 straight days, so was there an institutional interest there in denying that? Oftentimes, yes. I'm not sure which example they were citing at that time. The record discloses in even their questionnaires what the inmate understood the reason for the out-of-cell time restriction was, and generally they do reflect institutional requirements such as lockdowns based on violence, missing pieces of metal that the inmates used to create weapons, or other sorts of institutional restrictions that caused that to be- Right, did the district court look at that, or are we supposed to look at that, or how could we look at that? I mean, they presented evidence that 80% of their class members are receiving less than two hours per week. That could be permissible. It could also be not permissible. How are we supposed to figure that out? Now, I understand that's assuming that we get past this threshold question of, well, general population means you get 10 hours. Even if the court were to consider it, though, the evidence that the plaintiff submitted doesn't establish what the conditions in the general population are more broadly. They submitted a number of approximately 55 questionnaires that they presented themselves. Defendants identified numerous problems with them, including that they were anonymous so that the information couldn't be verified. They admitted on page 178 of the excerpts of the record that the surveys would be biased in favor of responses that were agreed, and that it only accounts for a one-month period, and only the responses of approximately 30. Your point is they just haven't, they haven't come up with their burden of proof. Even if we were to say general population means you get all, you're subject to all the regulations, you get all the same rights, the government's position is they haven't met their burden to prove the differences. Yes, there's 10 hours recommended, but if you were to go look at the non-SHU general population, they probably have less than 10 hours as well, on average, because certain percentage of them would have been restricted for any number of reasons, and they haven't put in any evidence of what that number is to compare to the survey that they put forward. Is that your position? Yes, Your Honor, with one additional point, I see that I'm out of time, if I could just make that one final point, that the representation that they kept referring to by somebody at CDCR that there were 10 hours of out-of-cell time in the general population, that was a representation made after the settlement agreement was entered into, and shouldn't factor into court's interpretation of that agreement, that's on page 114, sorry, 411 of the excerpt of the record. And I also understood that Your Honor had a question about the jurisdictional issue in the second case. Well, I did, and I guess now I'm even more confused because Mr. Fisher, and maybe I should have asked him, he suggested he's not representing the second case, so is there anyone representing the inmates in the second case right now? If I may, Your Honor? Yeah. We absolutely represent the class in the second appeal, which has to do with an order extending the term. I see, I misunderstood your answer, okay. I apologize for that, Your Honor, but that was just fully briefed and we'll be waiting on argument. Okay, okay. Mr. Fisher, go ahead. Our understanding was that this was the appeal for all of those. I understood that as well, so in fact, the case numbers I read off that are on our agenda are on the docket. That's why I got confused, because the case numbers that I read off are for both appeals, and I thought they were both fully briefed. So I'm assuming they're both before us, and Mr. Miller seems to have a different understanding there. So we'll have to sort out that confusion. Well, I had understood that we'd gotten all the briefing materials for both cases. That was my understanding, too. Mr. Miller, do you want to clarify that a little bit? Sorry to kind of jumble up everything, but this may be an important point. It certainly is, Your Honor. This comes as a great surprise to us. The briefing on the second appeal on the extension of the settlement agreement was just completed a few weeks ago. Well, but the notice for argument today includes all three case numbers, two of which are on the second appeal. Your Honor, all of the notices for the two issues, the general population and walk-alone issues that we've been discussing today have had all three case number, Ninth Circuit numbers on them, because they are related, they are the same case. I actually called the Ninth Circuit early when I saw that and asked, and they said, well, it's the same case, so they get all the numbers. So we... Okay, well, we're gonna have to do a little sorting out on our side. Fair enough, Mr. Miller. Thank you for your explanation, and if we need more, we'll come back. And must any of the other judges have more questions for clarification? Okay. Okay, I was looking to see what today's sheet was. I had thought that both cases were... I looked at it, that had been my understanding as well, but I think we probably need to look into this a little bit, and if we need to come back to the parties and set up another argument time for the second case, we'll determine how to proceed on that, Mr. Miller. We appreciate the court looking into that and advising us of whatever you determine. I will just say that the second appeal on the extension of the settlement agreement, it is a substantial appeal. There is extensive briefing. There are major issues. No, we understand. We've prepared it. So we understand. So, all right, thank you. Yes, Your Honor. Well, then if we're not dealing with that appeal, I wouldn't entertain any questions that the court has on that second appeal's jurisdictional issue, but if that's going to be referred to- I think let's defer that for now, and... And we would just ask that the court reverse the two orders and remediate one with that defense. Thank you. Okay, thank you, counsel. Thank you to both of you, and the case is now submitted. At least one of them is now submitted.
judges: Wallace, R. Nelson, Gwin